**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1603**

CONSOLIDATION COAL COMPANY,

Defendant – Appellant,

v.

GEORGIA POWER COMPANY,

Defendant – Appellee,

and

DUKE ENERGY PROGRESS, INC., Progress Energy Carolinas, Inc.,

Plaintiff,

and

UNION ELECTRIC COMPANY; AMERICAN ELECTRIC CORPORATION; TOWN OF BLACKSTONE, VIRGINIA; BONNER ELECTRIC, INC.; CHEVRON MINING, INC.; COHEN AND GREEN SALVAGE COMPANY, INC.; OWEN ELECTRIC STEEL COMPANY OF SOUTH CAROLINA and/or SMI-OWEN STEEL COMPANY, INC. and/or SMI STEEL, d/b/a CMC Steel South Carolina, an Alabama corporation operating a steel plant in Cayce, South Carolina and/or Commercial Metals Company as successors in interest to SMI Steel; COOPER INDUSTRIES, INC., as successor-in-interest for Abex Friction Products Division of Abex, Inc.; COTTER ELECTRIC COMPANY; CITY OF DOVER, DELAWARE; ENDICOTT CLAY PRODUCTS COMPANY; HAGERSTOWN LIGHT DEPARTMENT; HUNTSVILLE UTILITIES; JET ELECTRIC MOTOR CO., INC.; KELLY GENERATOR & EQUIPMENT, INC. AND/OR KELLY ELECTRICAL CONSTRUCTION, INC., f/k/a Kelly & Bishop Electrical Construction, Inc. and/or John E. Kelly & Sons Electrical Construction, Inc.; LAFARGE MID-ATLANTIC, LLC AND/OR LAFARGE MID-ATLANTIC, INC. AS SUCCESSOR-IN-INTEREST TO OR REDLAND GENSTAR, INC. AND GENSTAR STONE PRODUCTS, INC.; LEWIS ELECTRIC SUPPLY CO., INC.; CITY OF MASCOUTAH, ILLINOIS; M-P ELECTRICAL CONTRACTORS, INC.; NEW SOUTHERN OF

ROCKY MOUNT, INC.; NORTH CAROLINA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES; P.C. CAMPANA, INC.; PHOENIX SOLUTIONS COMPANY, as successor in interest to Plasma Energy Company; SURRY-YADKIN ELECTRIC MEMBERSHIP CORPORATION; TENNESSEE ASSOCIATED ELECTRIC, INC. OR TENNESSEE ASSOCIATED ELECTRIC, a/k/a Tennessee Associated Electric Holdings, Inc.; VENTECH ENGINEERS, INC., AND/OR VENTECH PROCESS EQUIPMENT, INC. AND/OR VENTECH EQUIPMENT INC. AND/OR THE VENTECH COMPANIES; W.R. SCHOFIELD CONSTRUCTION CO., INC.; OWEN ELECTRIC STEEL COMPANY OF SOUTH CAROLINA; VEOLIA ENVIRONMENTAL SERVICES WASTE-TO-ENERGY, f/k/a Montenay Power Corporation; INTERNATIONAL POWER MACHINERY COMPANY; 3M COMPANY; ALCAN PRIMARY PRODUCTS CORPORATION; ALCOA, INCORPORATED; AMERICAN SKIING COMPANY; APOGEE COAL COMPANY, LLC; APPALACHIAN POWER COMPANY; ARKEMA, INC., f/k/a Pennwalt Corporation; ATLANTIC CITY ELECTRIC COMPANY; BALTIMORE GAS AND ELECTRIC COMPANY; BASF CORPORATION; BASSETT FURNITURE INDUSTRIES, INCORPORATED; BAYER CROPSCIENCE, INCORPORATED; BEDFORD RURAL ELECTRIC COOPERATIVE, INC.; BLUE RIDGE ELECTRIC COOPERATIVE, INC.; BROAD RIVER ELECTRIC COOPERATIVE, INC.; BRUCE-MERRILEES ELECTRIC COMPANY; BUIST ELECTRIC, INC.; CAPE HATTERAS ELECTRIC MEMBERSHIP CORPORATION; CARGILL, INCORPORATED; CARLISLE SYNTEC, INCORPORATED; CARR AND DUFF, INC.; CATERPILLAR, INCORPORATED; CBS CORPORATION; UNITED STATES CENTRAL INTELLIGENCE AGENCY; UNITED STATES DEFENSE LOGISTICS AGENCY; UNITED STATES DEPARTMENT OF THE ARMY; UNITED STATES DEPARTMENT OF THE NAVY; UNITED TECHNOLOGIES CORPORATION; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; VIRGINIA ELECTRIC & POWER COMPANY (VEPCO); VULCAN CONSTRUCTION MATERIALS, LIMITED PARTNERSHIP; WARREN ELECTRIC COOPERATIVE, INCORPORATED; WARTBURG COLLEGE; WASHINGTON SUBURBAN SANITARY COMMISSION; WEST PENN POWER COMPANY; WEYERHAEUSER COMPANY; CENTRAL REGIONAL HOSPITAL; CHEMICAL PRODUCTS CORPORATION; CHERRY HOSPITAL; CHRISTUS HEALTH; CLEVELAND ELECTRIC COMPANY; COGENTRIX ENERGY, LLC; CONOCOPHILLIPS COMPANY; CONSUMERS ENERGY; COOPER TIRE & RUBBER COMPANY; CSX RESIDUAL COMPANY; DANNY CORPORATION; DEAN'S LIGHT BOX, INC.; DELMARVA POWER & LIGHT COMPANY; DIXON LUMBER COMPANY, INCORPORATED; DOMTAR PAPER COMPANY, LLC; DOREY ELECTRIC COMPANY; DUKE ENERGY CAROLINAS, LLC; DUQUESNE LIGHT COMPANY; EAST KENTUCKY POWER COOPERATIVE, INC.; ELECTRIC CONTROL EQUIPMENT CO.; ELECTRIC EQUIPMENT CORPORATION OF VIRGINIA; ENVIRONMENTAL PROTECTION SERVICES, INCORPORATED; ERACHEM COMILOG, INC.; FLORIDA POWER & LIGHT COMPANY; FOREMOST ELECTRIC & TRANSMISSION, INC.; FRONTIER COMMUNICATIONS CORPORATION; FURMAN UNIVERSITY; G&S MOTOR EQUIPMENT COMPANY, INC.; GENERAL ELECTRIC COMPANY; GENERAL

2

EXTRUSIONS, INC.; GKN DRIVELINE NORTH AMERICAN, INC.; GLADIEUX TRADING & MARKETING CO., LP, AND/OR LIMITED CORPORATION; GLENWOOD RESOLUTION AUTHORITY, INC.; GREEN CIRCLE GROWERS, INC.; GREENWOOD MILLS, INCORPORATED; GUERNSEY-MUSKINGUM ELECTRIC COOPERATIVE INC.; HAINES AND KIBBLEHOUSE, INC.; THE HOLLADAY CORPORATION, a/k/a Holladay Property Services Midwest, Inc.; HUDSON LIGHT AND POWER DEPARTMENT; IES COMMERCIAL, INC., AND/OR INTEGRATED ELECTRICAL SERVICES, INC.; IMERYS CARBONATES, LLC; INTERNATIONAL PAPER COMPANY; INTERTAPE POLYMER GROUP, INCORPORATED; CITY OF JACKSONVILLE, FLORIDA; JESSOP STEEL, LLC; KINGSPORT POWER COMPANY; KOBE COPPER PRODUCTS, INC.; KOCH INDUSTRIES, INCORPORATED; KRAFT FOODS GLOBAL, INCORPORATED; CITY OF LAKELAND, FLORIDA; LOCKWOOD'S ELECTRIC MOTOR SERVICE; TOWN OF LOUISBURG, NORTH CAROLINA; LWB REFRACTORIES COMPANY; MARTIN MARIETTA MATERIALS, INCORPORATED; MIDAMERICAN ENERGY COMPANY; MONONGAHELA POWER COMPANY; NIAGARA MOHAWK POWER CORPORATION; N.L. INDUSTRIES, INC.; NORFOLK SOUTHERN RAILWAY COMPANY; NORTH CAROLINA STATE UNIVERSITY; NORTH GEORGIA ELECTRIC MEMBERSHIP CORPORATION; HUNTINGTON INGALLS INCORPORATED; NUCOR CORPORATION; O'BERRY NEURO-MEDICAL CENTER; OCCIDENTAL CHEMICAL CORPORATION; PACTIV CORPORATION; PALMETTO ELECTRIC COOPERATIVE, INC.; PCS PHOSPHATE COMPANY, INCORPORATED; PHARMACIA CORPORATION; POTOMAC ELECTRIC POWER COMPANY; PPG INDUSTRIES, INCORPORATED; PPL ELECTRIC UTILITIES CORPORATION; ROYAL STREET JUNK COMPANY, INC.; SANTEE ELECTRIC COOPERATIVE, INCORPORATED; SARA LEE CORPORATION; SONOCO PRODUCTS COMPANY; SOUTH CENTRAL POWER COMPANY; SOUTHLAND ELECTRICAL SUPPLY, INC.; ST. JOSEPH MEDICAL CENTER, INC.; SUMTER ELECTRIC COOPERATIVE, INCORPORATED, a/k/a SECO Energy; T AND R ELECTRIC SUPPLY COMPANY, INC.; TENNESSEE ELECTRO MINERALS, INC.; TENNESSEE VALLEY AUTHORITY; TRAP ROCK, INC.; TREDEGAR FILM PRODUCTS CORPORATION; TRI-STATE ARMATURE & ELECTRICAL WORKS, INC.; UNIMIN CORPORATION; UNION CARBIDE CORPORATION; UNITED STATES AIR FORCE; SALES TRANSACTION DEFENDANTS LIAISON; JOHNSON/KERNER LIAISON GROUP,

     Defendants,

     and

BARNES & POWELL ELECTRICAL COMPANY, INC.; TRINITY INDUSTRIES, INCORPORATED; GEORGIA-PACIFIC, LLC; MELINZ REBAR, INC.; BABSON COLLEGE; VILLANOVA UNIVERSITY; BATESVILLE CASKET COMPANY, INCORPORATED; BAY MECHANICAL & ELECTRICAL CORPORATION; CEMEX CONSTRUCTION MATERIALS FL,

3

LLC; CITY OF WINSTON-SALEM, NORTH CAROLINA; DACCO INCORPORATED; DAVIS. JERRY INC.; DELAWARE ELECTRIC COOPERATIVE, INCORPORATED; E. LUKE GREENE COMPANY, INC.; J.C. BLAIR MEMORIAL HOSPITAL; KERR-MCGEE CORPORATION; MAGNETIC METALS CORPORATION; MASS. ELECTRIC CONSTRUCTION CO.; NATIONAL RAILROAD PASSENGER CORPORATION; NOVARTIS CORPORATION; ROBERT BOSCH LLC; SHO-ME POWER ELECTRIC COOPERATIVE; SEABROOK ENTERPRISES, INC.; ST. JOHN'S COLLEGE; TALLAHASSEE MEMORIAL HEALTHCARE, INC.; THE NORTH CAROLINA GRANITE CORPORATION; THE ROUSE COMPANY, LLC; THOMASVILLE FURNITURE INDUSTRIES, INCORPORATED; TRULAND CORPORATION; UPS GROUND FREIGHT, INC.; VILLANOVA UNIVERSITY IN THE STATE OF PENNSYLVANIA; EMMA L. BIXBY MEDICAL CENTER; GENCORP, INC.; PARKER-HANNIFIN CORPORATION; RILEY POWER, INC.; THE NATIONAL LIME AND STONE COMPANY; TIMKEN US LLC; WOODSTREAM CORPORATION; FABRI-KAL CORPORATION; HENKELS & MCCOY, INC.; OHIO VALLEY MEDICAL CENTER, INC.; SAINT AUGUSTINE'S COLLEGE; SOUTHERN ALLOY CORPORATION,

    Third Party Defendants.

-----------------------------

**No. 13-1617**

-----------------------------

CONSOLIDATION COAL COMPANY,

    Plaintiff – Appellant,

  and

PCS PHOSPHATE COMPANY, INC.,

    Third Party Plaintiff,

  v.

GEORGIA POWER COMPANY,

    Defendant – Appellee,

  and

UNION ELECTRIC COMPANY; AMERICAN ELECTRIC CORPORATION; TOWN OF BLACKSTONE, VIRGINIA; BONNER ELECTRIC, INC.; CHEVRON MINING, INC., as successor-in-interest to Pittsburg & Midway

4

Coal Mining Co.; OWEN ELECTRIC STEEL COMPANY OF SOUTH CAROLINA, and/or SMI OWEN STEEL COMPANY, INC., and/or SMI STEEL,d/b/a CMC Steel South Carolina and/or Commercial Metals Company; COHEN AND GREEN SALVAGE COMPANY, INC.; COOPER INDUSTRIES, INC., as successor-in-interest for Abex Friction Products Division of Abex, Inc.; COTTER ELECTRIC COMPANY; CITY OF DOVER, DELAWARE; ENDICOTT CLAY PRODUCTS COMPANY; HAGERSTOWN LIGHT DEPARTMENT; HUNTSVILLE UTILITIES; JET ELECTRIC MOTOR CO., INC.; LAFARGE MID-ATLANTIC, LLC AND/OR LAFARGE MID-ATLANTIC, INC. AS SUCCESSOR-IN-INTEREST TO OR REDLAND GENSTAR, INC. AND GENSTAR STONE PRODUCTS, INC.; LEWIS ELECTRIC SUPPLY CO., INC.; CITY OF MASCOUTAH, ILLINOIS; M-P ELECTRICAL CONTRACTORS, INC.; NEW SOUTHERN OF ROCKY MOUNT, INC.; NORTH CAROLINA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES; P.C. CAMPANA, INC.; PHOENIX SOLUTIONS COMPANY, as successor in interest to Plasma Energy Company; SURRY-YADKIN ELECTRIC MEMBERSHIP CORPORATION; TENNESSEE ASSOCIATED ELECTRIC, INC. OR TENNESSEE ASSOCIATED ELECTRIC, a/k/a Tennessee Associated Electric Holdings, Inc.; VENTECH ENGINEERS, INC., AND/OR VENTECH PROCESS EQUIPMENT, INC. AND/OR VENTECH EQUIPMENT INC. AND/OR THE VENTECH COMPANIES; VEOLIA ENVIRONMENTAL SERVICES WASTE-TO-ENERGY, f/k/a Montenay Power Corporation; W.R. SCHOFIELD CONSTRUCTION CO., INC.; KELLY GENERATOR & EQUIPMENT, INC. AND/OR KELLY ELECTRICAL CONSTRUCTION, INC., f/k/a Kelly & Bishop Electrical Construction, Inc. and/or John E. Kelly & Sons Electrical Construction, Inc.; OWEN ELECTRIC STEEL COMPANY OF SOUTH CAROLINA; 3M COMPANY; ALCAN PRIMARY PRODUCTS CORPORATION; ALCOA, INCORPORATED; AMERICAN SKIING COMPANY; APOGEE COAL COMPANY, L.L.C.; APPALACHIAN POWER COMPANY; ARKEMA, INC.; ATLANTIC CITY ELECTRIC COMPANY; BALTIMORE GAS AND ELECTRIC COMPANY; BASF CORPORATION; BAYER CROPSCIENCE, INCORPORATED; BEDFORD RURAL ELECTRIC COOPERATIVE, INC.; BLUE RIDGE ELECTRIC COOPERATIVE, INC.; BROAD RIVER ELECTRIC COOPERATIVE, INC.; BRUCE-MERRILEES ELECTRIC COMPANY; BUIST ELECTRIC, INC.; CAPE HATTERAS ELECTRIC MEMBERSHIP CORPORATION; CARGILL, INCORPORATED; CARLISLE SYNTEC, INCORPORATED; DUKE ENERGY PROGRESS, INC.; CARR AND DUFF, INC.; CATERPILLAR, INCORPORATED; CBS CORPORATION; CENTRAL REGIONAL HOSPITAL; CHEMICAL PRODUCTS CORPORATION; CHERRY HOSPITAL; CHRISTUS HEALTH; CLEVELAND ELECTRIC COMPANY; COGENTRIX ENERGY, LLC; CONOCOPHILLIPS COMPANY; CONSUMERS ENERGY COMPANY; COOPER TIRE & RUBBER COMPANY; CSX RESIDUAL COMPANY; DANNY CORPORATION; DEAN'S LIGHT BOX, INC.; DELMARVA POWER & LIGHT COMPANY; DIXON LUMBER COMPANY, INCORPORATED; DOMTAR PAPER COMPANY, LLC; DOREY ELECTRIC COMPANY; DUKE ENERGY CAROLINAS, LLC; DUQUESNE LIGHT COMPANY; EAST KENTUCKY

POWER COOPERATIVE, INC.; ELECTRIC CONTROL EQUIPMENT CO.; ELECTRIC EQUIPMENT CORPORATION OF VIRGINIA; ENVIRONMENTAL PROTECTION SERVICES, INCORPORATED; ERACHEM COMILOG, INC.; FLORIDA POWER & LIGHT COMPANY; FOREMOST ELECTRIC & TRANSMISSION, INC.; FRONTIER COMMUNICATIONS CORPORATION; FURMAN UNIVERSITY; G&S MOTOR EQUIPMENT COMPANY, INC.; GENERAL ELECTRIC COMPANY; GENERAL EXTRUSIONS, INC.; GKN DRIVELINE NORTH AMERICAN, INC.; GLENWOOD RESOLUTION AUTHORITY, INC.; GREEN CIRCLE GROWERS, INC.; GREENWOOD MILLS, INCORPORATED; GUERNSEY-MUSKINGUM ELECTRIC COOPERATIVE, INC.; HAINES AND KIBBLEHOUSE, INC.; HUDSON LIGHT AND POWER DEPARTMENT; IMERYS CARBONATES, LLC; INTERNATIONAL POWER MACHINERY COMPANY; INTERNATIONAL PAPER COMPANY; INTERTAPE POLYMER GROUP, INCORPORATED; KINGSPORT POWER COMPANY; KOBE COPPER PRODUCTS, INC.; KOCH INDUSTRIES, INCORPORATED; KRAFT FOODS GLOBAL, INCORPORATED; CITY OF LAKELAND, FLORIDA; LOCKWOOD'S ELECTRIC MOTOR SERVICE; TOWN OF LOUISBURG, NORTH CAROLINA; LWB REFRACTORIES COMPANY; MARTIN MARIETTA MATERIALS, INCORPORATED; MIDAMERICAN ENERGY COMPANY; MONONGAHELA POWER COMPANY; NIAGARA MOHAWK POWER CORPORATION, d/b/a National Grid; NL INDUSTRIES, INC.; NORFOLK SOUTHERN RAILWAY COMPANY; NORTH GEORGIA ELECTRIC MEMBERSHIP CORPORATION; NUCOR CORPORATION; O'BERRY NEURO-MEDICAL CENTER; OCCIDENTAL CHEMICAL CORPORATION; PACTIV CORPORATION; PALMETTO ELECTRIC COOPERATIVE, INC.; PHARMACIA CORPORATION; POTOMAC ELECTRIC POWER COMPANY; PPL ELECTRIC UTILITIES CORPORATION; ROYAL STREET JUNK COMPANY, INC.; SANTEE ELECTRIC COOPERATIVE, INCORPORATED; SARA LEE CORPORATION, d/b/a Hillshire Farms; SONOCO PRODUCTS COMPANY; SOUTH CENTRAL POWER COMPANY; SOUTHLAND ELECTRICAL SUPPLY, INC.; ST. JOSEPH MEDICAL CENTER, INC.; SUMTER ELECTRIC COOPERATIVE, INCORPORATED, d/b/a SECO Energy; T AND R ELECTRIC SUPPLY COMPANY, INC.; TENNESSEE ELECTRO-MINERALS, INC.; TENNESSEE VALLEY AUTHORITY; TRAP ROCK, INC.; TREDEGAR FILM PRODUCTS CORPORATION; TRI-STATE ARMATURE & ELECTRICAL WORKS, INC.; UNIMIN CORPORATION; UNION CARBIDE CORPORATION; UNITED STATES DEFENSE LOGISTICS AGENCY; UNITED STATES DEPARTMENT OF THE ARMY; UNITED STATES DEPARTMENT OF THE NAVY; VIRGINIA ELECTRIC & POWER COMPANY; VULCAN CONSTRUCTION MATERIALS, L. P.; WARREN ELECTRIC COOPERATIVE, INCORPORATED; WARTBURG COLLEGE; WASHINGTON SUBURBAN SANITARY COMMISSION; WEYERHAEUSER COMPANY; WEST PENN POWER COMPANY; SALES TRANSACTION DEFENDANTS LIAISON; VILLANOVA UNIVERSITY IN THE STATE OF PENNSYLVANIA; HUNTINGTON INGALLS INCORPORATED; JOHNSON/KERNER LIAISON GROUP; WHEELABRATOR TECHNOLOGIES, INCORPORATED, CELANESE CORPORATION, THE CENTRAL INTELLIGENCE AGENCY, GLADIEUX TRADING & MARKETING COMPANY, L.P., HOLLADAY

6

PROPERTY SERVICES MIDWEST, INC., INTEGRATED ELECTRICAL SERVICES, INC., JESSOP STEEL COMPANY, NORTH CAROLINA STATE UNIVERSITY IS A CONSTITUENT OF THE UNIVERSITY OF NORTH CAROLINA, PEACE COLLEGE OF RALEIGH, INC., UNITED STATES DEPARTMENT OF THE AIR FORCE, UNITED TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, A CONSTITUENT INSTITUTION OF THE UNIVERSITY OF NORTH CAROLINA AND POWER MACHINERY COMPANY,

Defendants,

and

TRINITY INDUSTRIES, INCORPORATED; VILLANOVA UNIVERSITY; BABSON COLLEGE; BARNES & POWELL ELECTRICAL COMPANY, INC.; BATESVILLE CASKET COMPANY, INCORPORATED; BAY MECHANICAL & ELECTRICAL CORPORATION; CEMEX CONSTRUCTION MATERIALS FL, LLC; CITY OF WINSTON-SALEM, NORTH CAROLINA; DACCO INCORPORATED; DAVIS. JERRY INC.; DELAWARE ELECTRIC COOPERATIVE, INCORPORATED; E. LUKE GREENE COMPANY, INC.; FABRI-KAL CORPORATION; HENKELS & MCCOY, INC.; IES COMMERCIAL, INC., AND/OR INTEGRATED ELECTRICAL SERVICES, INC.; J.C. BLAIR MEMORIAL HOSPITAL; KERR-MCGEE CORPORATION; MAGNETIC METALS CORPORATION; MASS. ELECTRIC CONSTRUCTION CO.; MELINZ REBAR, INC.; NATIONAL RAILROAD PASSENGER CORPORATION; NOVARTIS CORPORATION; OHIO VALLEY MEDICAL CENTER, INC.; ROBERT BOSCH LLC; SHO-ME POWER ELECTRIC COOPERATIVE; SAINT AUGUSTINE'S COLLEGE; SEABROOK ENTERPRISES, INC.; SOUTHERN ALLOY CORPORATION; ST. JOHN'S COLLEGE; TALLAHASSEE MEMORIAL HEALTHCARE, INC.; THE NORTH CAROLINA GRANITE CORPORATION; THE ROUSE COMPANY, LLC; THOMASVILLE FURNITURE INDUSTRIES, INCORPORATED; TRULAND CORPORATION; UPS GROUND FREIGHT, INC.; GENCORP, INC.; PARKER-HANNIFIN CORPORATION; THE NATIONAL LIME AND STONE COMPANY; TIMKEN US LLC; WOODSTREAM CORPORATION; EMMA L. BIXBY MEDICAL CENTER; RILEY POWER, INC.,

Third Party Defendants.

---

**No. 13-1664**

---

PCS PHOSPHATE COMPANY, INC.,

Defendant – Appellant,

7

                    v.

GEORGIA POWER COMPANY,

                    Defendant – Appellee,

          and

DUKE ENERGY PROGRESS, INC., d/b/a Progress Energy Carolinas,
Incorporated,

                    Plaintiff,

          and

UNION ELECTRIC COMPANY; AMERICAN ELECTRIC CORPORATION; TOWN
OF BLACKSTONE, VIRGINIA; BONNER ELECTRIC, INC.; CHEVRON
MINING, INC., as successor-in-interest to Pittsburg & Midway
Coal Mining Company; COHEN AND GREEN SALVAGE COMPANY, INC.;
OWEN ELECTRIC STEEL COMPANY OF SOUTH CAROLINA and/or SMI-
OWEN STEEL COMPANY, INC. and/or SMI STEEL, d/b/a CMC Steel
South Carolina, an Alabama corporation operating a steel
plant in Cayce, South Carolina and/or Commercial Metals
Company as successors in interest to SMI Steel; COOPER
INDUSTRIES, INC., as successor-in-interest for Abex Friction
Products Division of Abex, Inc.; COTTER ELECTRIC COMPANY;
CITY OF DOVER, DELAWARE; ENDICOTT CLAY PRODUCTS COMPANY;
HAGERSTOWN LIGHT DEPARTMENT; HUNTSVILLE UTILITIES; JET
ELECTRIC MOTOR CO., INC.; KELLY GENERATOR & EQUIPMENT, INC.
AND/OR KELLY ELECTRICAL CONSTRUCTION, INC., f/k/a Kelly &
Bishop Electrical Construction, Inc. and/or John E. Kelly &
Sons Electrical Construction, Inc.; LAFARGE MID-ATLANTIC,
LLC AND/OR LAFARGE MID-ATLANTIC, INC. AS SUCCESSOR-IN-
INTEREST TO OR REDLAND GENSTAR, INC. AND GENSTAR STONE
PRODUCTS, INC.; LEWIS ELECTRIC SUPPLY CO., INC.; CITY OF
MASCOUTAH, ILLINOIS; M-P ELECTRICAL CONTRACTORS, INC.; NEW
SOUTHERN OF ROCKY MOUNT, INC.; NORTH CAROLINA DEPARTMENT OF
AGRICULTURE AND CONSUMER SERVICES; P.C. CAMPANA, INC.;
PHOENIX SOLUTIONS COMPANY, as successor in interest to
Plasma Energy Company; SURRY-YADKIN ELECTRIC MEMBERSHIP
CORPORATION; TENNESSEE ASSOCIATED ELECTRIC, INC. OR
TENNESSEE ASSOCIATED ELECTRIC, a/k/a Tennessee Associated
Electric Holdings, Inc.; VENTECH ENGINEERS, INC., AND/OR
VENTECH PROCESS EQUIPMENT, INC. AND/OR VENTECH EQUIPMENT
INC. AND/OR THE VENTECH COMPANIES; W.R. SCHOFIELD
CONSTRUCTION CO., INC.; OWEN ELECTRIC STEEL COMPANY OF SOUTH
CAROLINA; VEOLIA ENVIRONMENTAL SERVICES WASTE-TO-ENERGY,

                            8

f/k/a Montenay Power Corporation; INTERNATIONAL POWER MACHINERY COMPANY; 3M COMPANY; ALCAN PRIMARY PRODUCTS CORPORATION; ALCOA, INCORPORATED; AMERICAN SKIING COMPANY; APOGEE COAL COMPANY, LLC; APPALACHIAN POWER COMPANY; ARKEMA, INC., f/k/a Pennwalt Corporation; ATLANTIC CITY ELECTRIC COMPANY; BALTIMORE GAS AND ELECTRIC COMPANY; BASF CORPORATION; BASSETT FURNITURE INDUSTRIES, INCORPORATED; BAYER CROPSCIENCE, INCORPORATED; BEDFORD RURAL ELECTRIC COOPERATIVE, INC.; BLUE RIDGE ELECTRIC COOPERATIVE, INC.; BROAD RIVER ELECTRIC COOPERATIVE, INC.; BRUCE-MERRILEES ELECTRIC COMPANY; BUIST ELECTRIC, INC.; CAPE HATTERAS ELECTRIC MEMBERSHIP CORPORATION; CARGILL, INCORPORATED; CARLISLE SYNTEC, INCORPORATED; CARR AND DUFF, INC.; CATERPILLAR, INCORPORATED; CBS CORPORATION; UNITED STATES CENTRAL INTELLIGENCE AGENCY; UNITED STATES DEFENSE LOGISTICS AGENCY; UNITED STATES DEPARTMENT OF THE ARMY; UNITED STATES DEPARTMENT OF THE NAVY; UNITED TECHNOLOGIES CORPORATION; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; VIRGINIA ELECTRIC AND POWER COMPANY (VEPCO); VULCAN CONSTRUCTION MATERIALS, LIMITED PARTNERSHIP; WARREN ELECTRIC COOPERATIVE, INCORPORATED; WARTBURG COLLEGE; WASHINGTON SUBURBAN SANITARY COMMISSION; WEST PENN POWER COMPANY; WEYERHAEUSER COMPANY; CENTRAL REGIONAL HOSPITAL; CHEMICAL PRODUCTS CORPORATION; CHERRY HOSPITAL; CHRISTUS HEALTH; CLEVELAND ELECTRIC COMPANY; COGENTRIX ENERGY, LLC; CONOCOPHILLIPS COMPANY; CONSOLIDATION COAL COMPANY; CONSUMERS ENERGY COMPANY; COOPER TIRE & RUBBER COMPANY; CSX RESIDUAL COMPANY; DANNY CORPORATION; DEAN'S LIGHT BOX, INC.; DELMARVA POWER & LIGHT COMPANY; DIXON LUMBER COMPANY, INCORPORATED; DOMTAR PAPER COMPANY, LLC; DOREY ELECTRIC COMPANY; DUKE ENERGY CAROLINAS, LLC; DUQUESNE LIGHT COMPANY; EAST KENTUCKY POWER COOPERATIVE, INC.; ELECTRIC CONTROL EQUIPMENT CO.; ELECTRIC EQUIPMENT CORPORATION OF VIRGINIA; ENVIRONMENTAL PROTECTION SERVICES, INCORPORATED; ERACHEM COMILOG, INC.; FLORIDA POWER & LIGHT COMPANY; FOREMOST ELECTRIC & TRANSMISSION, INC.; FRONTIER COMMUNICATIONS CORPORATION; FURMAN UNIVERSITY; G&S MOTOR EQUIPMENT COMPANY, INC.; GENERAL ELECTRIC COMPANY; GENERAL EXTRUSIONS, INC.; GKN DRIVELINE NORTH AMERICAN, INC.; GLADIEUX TRADING & MARKETING CO., LP, AND/OR LIMITED CORPORATION; GLENWOOD RESOLUTION AUTHORITY, INC.; GREEN CIRCLE GROWERS, INC.; GREENWOOD MILLS, INCORPORATED; GUERNSEY-MUSKINGUM ELECTRIC COOPERATIVE INC.; HAINES AND KIBBLEHOUSE, INC.; THE HOLLADAY CORPORATION, a/k/a Holladay Property Services Midwest, Inc.; HUDSON LIGHT AND POWER DEPARTMENT; IES COMMERCIAL, INC., AND/OR INTEGRATED ELECTRICAL SERVICES, INC.; IMERYS CARBONATES, LLC; INTERNATIONAL PAPER COMPANY; INTERTAPE POLYMER GROUP,

9

INCORPORATED; CITY OF JACKSONVILLE, FLORIDA; JESSOP STEEL, LLC; KINGSPORT POWER COMPANY; KOBE COPPER PRODUCTS, INC.; KOCH INDUSTRIES, INCORPORATED; KRAFT FOODS GLOBAL, INCORPORATED; CITY OF LAKELAND, FLORIDA; LOCKWOOD'S ELECTRIC MOTOR SERVICE; TOWN OF LOUISBURG, NORTH CAROLINA; LWB REFRACTORIES COMPANY; MARTIN MARIETTA MATERIALS, INCORPORATED; MIDAMERICAN ENERGY COMPANY; MONONGAHELA POWER COMPANY; NIAGARA MOHAWK POWER CORPORATION; N.L. INDUSTRIES, INC.; NORFOLK SOUTHERN RAILWAY COMPANY; NORTH CAROLINA STATE UNIVERSITY; NORTH GEORGIA ELECTRIC MEMBERSHIP CORPORATION; HUNTINGTON INGALLS INCORPORATED; NUCOR CORPORATION; O'BERRY NEURO-MEDICAL CENTER; OCCIDENTAL CHEMICAL CORPORATION; PACTIV CORPORATION; PALMETTO ELECTRIC COOPERATIVE, INC.; PHARMACIA CORPORATION; POTOMAC ELECTRIC POWER COMPANY; PPG INDUSTRIES, INCORPORATED; PPL ELECTRIC UTILITIES CORPORATION; ROYAL STREET JUNK COMPANY, INC.; SANTEE ELECTRIC COOPERATIVE, INCORPORATED; SARA LEE CORPORATION; SONOCO PRODUCTS COMPANY; SOUTH CENTRAL POWER COMPANY; SOUTHLAND ELECTRICAL SUPPLY, INC.; ST. JOSEPH MEDICAL CENTER, INC.; SUMTER ELECTRIC COOPERATIVE, INCORPORATED, a/k/a SECO Energy; T AND R ELECTRIC SUPPLY COMPANY, INC.; TENNESSEE ELECTRO MINERALS, INC.; TENNESSEE VALLEY AUTHORITY; TRAP ROCK, INC.; TREDEGAR FILM PRODUCTS CORPORATION; TRI-STATE ARMATURE & ELECTRICAL WORKS, INC.; UNIMIN CORPORATION; UNION CARBIDE CORPORATION; UNITED STATES AIR FORCE; SALES TRANSACTION DEFENDANTS LIAISON; JOHNSON/KERNER LIAISON GROUP,

     Defendants,

     and

BARNES & POWELL ELECTRICAL COMPANY, INC.; TRINITY INDUSTRIES, INCORPORATED; GEORGIA-PACIFIC, LLC; MELINZ REBAR, INC.; BABSON COLLEGE; VILLANOVA UNIVERSITY; BATESVILLE CASKET COMPANY, INCORPORATED; BAY MECHANICAL & ELECTRICAL CORPORATION; CEMEX CONSTRUCTION MATERIALS FL, LLC; CITY OF WINSTON-SALEM, NORTH CAROLINA; DACCO INCORPORATED; DAVIS. JERRY INC.; DELAWARE ELECTRIC COOPERATIVE, INCORPORATED; E. LUKE GREENE COMPANY, INC.; FABRI-KAL CORPORATION; HENKELS & MCCOY, INC.; J.C. BLAIR MEMORIAL HOSPITAL; KERR-MCGEE CORPORATION; MAGNETIC METALS CORPORATION; MASS. ELECTRIC CONSTRUCTION CO.; NATIONAL RAILROAD PASSENGER CORPORATION; NOVARTIS CORPORATION; OHIO VALLEY MEDICAL CENTER, INC.; ROBERT BOSCH LLC; SHO-ME POWER ELECTRIC COOPERATIVE; SAINT AUGUSTINE'S COLLEGE; SEABROOK ENTERPRISES, INC.; SOUTHERN ALLOY CORPORATION; ST. JOHN'S

10

COLLEGE; TALLAHASSEE MEMORIAL HEALTHCARE, INC.; THE NORTH CAROLINA GRANITE CORPORATION; THE ROUSE COMPANY, LLC; THOMASVILLE FURNITURE INDUSTRIES, INCORPORATED; TRULAND CORPORATION; UPS GROUND FREIGHT, INC.; VILLANOVA UNIVERSITY IN THE STATE OF PENNSYLVANIA; EMMA L. BIXBY MEDICAL CENTER; GENCORP, INC.; PARKER-HANNIFIN CORPORATION; RILEY POWER, INC.; THE NATIONAL LIME AND STONE COMPANY; TIMKEN US LLC; WOODSTREAM CORPORATION,

        Third Party Defendants.

─────────────

**No. 13-1666**

─────────────

CONSOLIDATION COAL COMPANY,

        Plaintiff,

    and

PCS PHOSPHATE COMPANY, INC.,

        Defendant – Appellant,

    v.

GEORGIA POWER COMPANY,

        Defendant – Appellee,

    and

UNION ELECTRIC COMPANY; AMERICAN ELECTRIC CORPORATION; TOWN OF BLACKSTONE, VIRGINIA; BONNER ELECTRIC, INC.; CHEVRON MINING, INC., as successor-in-interest to Pittsburg & Midway Coal Mining Co.; OWEN ELECTRIC STEEL COMPANY OF SOUTH CAROLINA and/or SMI OWEN STEEL COMPANY, INC., and/or SMI STEEL, d/b/a CMC Steel South Carolina and/or Commercial Metals Company; COHEN AND GREEN SALVAGE COMPANY, INC.; COOPER INDUSTRIES, INC., as successor-in-interest for Abex Friction Products Division of Abex, Inc.; COTTER ELECTRIC COMPANY; CITY OF DOVER, DELAWARE; ENDICOTT CLAY PRODUCTS COMPANY; HAGERSTOWN LIGHT DEPARTMENT; HUNTSVILLE UTILITIES; JET ELECTRIC MOTOR CO., INC.; LAFARGE MID-ATLANTIC, LLC AND/OR LAFARGE MID-ATLANTIC, INC. AS SUCCESSOR-IN-INTEREST

11

TO OR REDLAND GENSTAR, INC. AND GENSTAR STONE PRODUCTS, INC.; LEWIS ELECTRIC SUPPLY CO., INC.; CITY OF MASCOUTAH, ILLINOIS; M-P ELECTRICAL CONTRACTORS, INC.; NEW SOUTHERN OF ROCKY MOUNT, INC.; NORTH CAROLINA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES; P.C. CAMPANA, INC.; PHOENIX SOLUTIONS COMPANY, as successor in interest to Plasma Energy Company; SURRY YADKIN ELECTRIC MEMBERSHIP CORPORATION; TENNESSEE ASSOCIATED ELECTRIC, INC. OR TENNESSEE ASSOCIATED ELECTRIC, a/k/a Tennessee Associated Electric Holdings, Inc.; VENTECH ENGINEERS, INC., AND/OR VENTECH PROCESS EQUIPMENT, INC. AND/OR VENTECH EQUIPMENT INC. AND/OR THE VENTECH COMPANIES; VEOLIA ENVIRONMENTAL SERVICES WASTE-TO-ENERGY, f/k/a Montenay Power Corporation; W.R. SCHOFIELD CONSTRUCTION CO., INC.; KELLY GENERATOR & EQUIPMENT, INC. AND/OR KELLY ELECTRICAL CONSTRUCTION, INC., f/k/a Kelly & Bishop Electrical Construction, Inc. and/or John E. Kelly & Sons Electrical Construction, Inc.; OWEN ELECTRIC STEEL COMPANY OF SOUTH CAROLINA; 3M COMPANY; ALCAN PRIMARY PRODUCTS CORPORATION; ALCOA, INCORPORATED; AMERICAN SKIING COMPANY; APOGEE COAL COMPANY, L.L.C.; APPALACHIAN POWER COMPANY; ARKEMA, INC.; ATLANTIC CITY ELECTRIC COMPANY; BALTIMORE GAS AND ELECTRIC COMPANY; BASF CORPORATION; BAYER CROPSCIENCE, INCORPORATED; BEDFORD RURAL ELECTRIC COOPERATIVE, INC.; BLUE RIDGE ELECTRIC COOPERATIVE, INC.; BROAD RIVER ELECTRIC COOPERATIVE, INC.; BRUCE-MERRILEES ELECTRIC COMPANY; BUIST ELECTRIC, INC.; CAPE HATTERAS ELECTRIC MEMBERSHIP CORPORATION; CARGILL, INCORPORATED; CARLISLE SYNTEC, INCORPORATED; DUKE ENERGY PROGRESS, INC.; CARR AND DUFF, INC.; CATERPILLAR, INCORPORATED; CBS CORPORATION; CENTRAL REGIONAL HOSPITAL; CHEMICAL PRODUCTS CORPORATION; CHERRY HOSPITAL; CHRISTUS HEALTH; CLEVELAND ELECTRIC COMPANY; COGENTRIX ENERGY, LLC; CONOCOPHILLIPS, COMPANY ; CONSUMERS ENERGY COMPANY; COOPER TIRE & RUBBER COMPANY; CSX RESIDUAL COMPANY; DANNY CORPORATION; DEAN'S LIGHT BOX, INC.; DELMARVA POWER & LIGHT COMPANY; DIXON LUMBER COMPANY, INCORPORATED; DOMTAR PAPER COMPANY, LLC; DOREY ELECTRIC COMPANY; DUKE ENERGY CAROLINAS, LLC; DUQUESNE LIGHT COMPANY; EAST KENTUCKY POWER COOPERATIVE, INC.; ELECTRIC CONTROL EQUIPMENT CO.; ELECTRIC EQUIPMENT CORPORATION OF VIRGINIA; ENVIRONMENTAL PROTECTION SERVICES, INCORPORATED; ERACHEM COMILOG, INC.; FLORIDA POWER & LIGHT COMPANY; FOREMOST ELECTRIC & TRANSMISSION, INC.; FRONTIER COMMUNICATIONS CORPORATION; FURMAN UNIVERSITY; G&S MOTOR EQUIPMENT COMPANY, INC.; GENERAL ELECTRIC COMPANY; GENERAL EXTRUSIONS, INC.; GKN DRIVELINE NORTH AMERICAN, INC.; GLENWOOD RESOLUTION AUTHORITY, INC.; GREEN CIRCLE GROWERS, INC.; GREENWOOD MILLS, INCORPORATED; GUERNSEY-MUSKINGUM ELECTRIC

12

COOPERATIVE, INC.; HAINES AND KIBBLEHOUSE, INC.; HUDSON LIGHT AND POWER DEPARTMENT; IMERYS CARBONATES, LLC; INTERNATIONAL POWER MACHINERY COMPANY; INTERNATIONAL PAPER COMPANY; INTERTAPE POLYMER GROUP, INCORPORATED; KINGSPORT POWER COMPANY; KOBE COPPER PRODUCTS, INC.; KOCH INDUSTRIES, INCORPORATED; KRAFT FOODS GLOBAL, INCORPORATED; CITY OF LAKELAND, FLORIDA; LOCKWOOD'S ELECTRIC MOTOR SERVICE; TOWN OF LOUISBURG, NORTH CAROLINA; LWB REFRACTORIES COMPANY; MARTIN MARIETTA MATERIALS, INCORPORATED; MIDAMERICAN ENERGY COMPANY; MONONGAHELA POWER COMPANY; NIAGARA MOHAWK POWER CORPORATION, d/b/a National Grid; N.L. INDUSTRIES, INC.; NORFOLK SOUTHERN RAILWAY COMPANY; NORTH GEORGIA ELECTRIC MEMBERSHIP CORPORATION; NUCOR CORPORATION; O'BERRY NEURO-MEDICAL CENTER; OCCIDENTAL CHEMICAL CORPORATION; PACTIV CORPORATION; PALMETTO ELECTRIC COOPERATIVE, INC.; PHARMACIA CORPORATION; POTOMAC ELECTRIC POWER COMPANY; PPL ELECTRIC UTILITIES CORPORATION; ROYAL STREET JUNK COMPANY, INC.; SANTEE ELECTRIC COOPERATIVE, INCORPORATED; SARA LEE CORPORATION, d/b/a Hillshire Farms; SONOCO PRODUCTS COMPANY; SOUTH CENTRAL POWER COMPANY; SOUTHLAND ELECTRICAL SUPPLY, INC.; ST. JOSEPH MEDICAL CENTER, INC.; SUMTER ELECTRIC COOPERATIVE, INCORPORATED, d/b/a SECO Energy; T AND R ELECTRIC SUPPLY COMPANY, INC.; TENNESSEE ELECTRO-MINERALS, INC.; TENNESSEE VALLEY AUTHORITY; TRAP ROCK, INC.; TREDEGAR FILM PRODUCTS CORPORATION; TRI-STATE ARMATURE & ELECTRICAL WORKS, INC.; UNIMIN CORPORATION; UNION CARBIDE CORPORATION; UNITED STATES DEFENSE LOGISTICS AGENCY; UNITED STATES DEPARTMENT OF THE ARMY; UNITED STATES DEPARTMENT OF THE NAVY; VIRGINIA ELECTRIC & POWER COMPANY (VEPCO); VULCAN CONSTRUCTION MATERIALS, L.P. ; WARREN ELECTRIC COOPERATIVE, INCORPORATED; WARTBURG COLLEGE; WASHINGTON SUBURBAN SANITARY COMMISSION; WEYERHAEUSER COMPANY; WEST PENN POWER COMPANY; SALES TRANSACTION DEFENDANTS LIAISON; VILLANOVA UNIVERSITY IN THE STATE OF PENNSYLVANIA; HUNTINGTON INGALLS INCORPORATED; JOHNSON/KERNER LIAISON GROUP; WHEELABRATOR TECHNOLOGIES, INCORPORATED; CELANESE CORPORATION; THE CENTRAL INTELLIGENCE AGENCY; GLADIEUX TRADING & MARKETING COMPANY, L.P.; HOLLADAY PROPERTY SERVICES MIDWEST, INC.; INTEGRATED ELECTRICAL SERVICES, INCORPORATED; JESSOP STEEL COMPANY, now known as Jessop Steel, LLC; NORTH CAROLINA STATE UNIVERSITY IS A CONSTITUENT OF THE UNIVERSITY OF NORTH CAROLINA; PEACE COLLEGE OF RALEIGH, INC.; UNITED STATES DEPARTMENT OF THE AIR FORCE; UNITED TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION; UNIVERSITY OF NORTH

CAROLINA AT CHAPEL HILL, A CONSTITUENT INSTITUTION OF THE UNIVERSITY OF NORTH CAROLINA; POWER MACHINERY COMPANY,

Defendants,

and

TRINITY INDUSTRIES, INCORPORATED; VILLANOVA UNIVERSITY; BABSON COLLEGE; BARNES & POWELL ELECTRICAL COMPANY, INC.; BATESVILLE CASKET COMPANY, INCORPORATED; BAY MECHANICAL & ELECTRICAL CORPORATION; CEMEX CONSTRUCTION MATERIALS FL, LLC; CITY OF WINSTON-SALEM, NORTH CAROLINA; DACCO INCORPORATED; DAVIS. JERRY INC.; DELAWARE ELECTRIC COOPERATIVE, INCORPORATED; E. LUKE GREENE COMPANY, INC.; FABRI-KAL CORPORATION; HENKELS & MCCOY, INC.; IES COMMERCIAL, INC., AND/OR INTEGRATED ELECTRICAL SERVICES, INC.; J.C. BLAIR MEMORIAL HOSPITAL; KERR-MCGEE CORPORATION; MAGNETIC METALS CORPORATION; MASS. ELECTRIC CONSTRUCTION CO.; MELINZ REBAR, INC.; NATIONAL RAILROAD PASSENGER CORPORATION; NOVARTIS CORPORATION; OHIO VALLEY MEDICAL CENTER, INC.; ROBERT BOSCH LLC; SHO-ME POWER ELECTRIC COOPERATIVE; SAINT AUGUSTINE'S COLLEGE; SEABROOK ENTERPRISES, INC.; SOUTHERN ALLOY CORPORATION; ST. JOHN'S COLLEGE; TALLAHASSEE MEMORIAL HEALTHCARE, INC.; THE NORTH CAROLINA GRANITE CORPORATION; THE ROUSE COMPANY, LLC; THOMASVILLE FURNITURE INDUSTRIES, INCORPORATED; TRULAND CORPORATION; UPS GROUND FREIGHT, INC.; GENCORP, INC.; PARKER-HANNIFIN CORPORATION; THE NATIONAL LIME AND STONE COMPANY; TIMKEN US LLC; WOODSTREAM CORPORATION; EMMA L. BIXBY MEDICAL CENTER; RILEY POWER, INC.,

Third Party Defendants.

---

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh. Louise W. Flanagan, District Judge. (5:08-cv-00460-FL; 5:08-cv-00463-FL)

---

Argued: October 30, 2014        Decided: March 20, 2015

---

Before SHEDD, AGEE, and WYNN, Circuit Judges.

---

14

Affirmed by published opinion. Judge Agee wrote the majority opinion, in which Judge Shedd joined. Judge Wynn wrote a dissenting opinion.

———————————

**ARGUED:** Daniel M. Darragh, COHEN & GRIGSBY, P.C., Pittsburgh, Pennsylvania; Michael Howard Ginsberg, JONES DAY, Pittsburgh, Pennsylvania, for Appellants. Daniel S. Reinhardt, TROUTMAN SANDERS LLP, Atlanta, Georgia, for Appellee. **ON BRIEF:** Julie W. Vanneman**,** COHEN & GRIGSBY, P.C., Pittsburgh, Pennsylvania, for Appellant Consolidation Coal Company. Brian J. Murray, Chicago, Illinois, Mary Beth Deemer, JONES DAY, Pittsburgh, Pennsylvania, for Appellant PCS Phosphate Company, Incorporated. Hollister A. Hill, Jaime L. Theriot, Atlanta, Georgia, Whitney S. Waldenberg, TROUTMAN SANDERS LLP, Raleigh, North Carolina, for Appellee.

———————————

AGEE, Circuit Judge:

In the early 1980s, Georgia Power, a utility company that supplies power to most of Georgia, sold many of its used electrical transformers at auction to Ward Transformer Company ("Ward"). These electrical transformers contained insulating oil, and some of that oil contained polychlorinated biphenyls ("PCBs"), toxic compounds that have been banned since 1979. Ward repaired and rebuilt used transformers, including those it purchased from Georgia Power, for resale to meet third-party customers' specifications. In the process, Ward's Raleigh, North Carolina, facility (the "Ward Site") became contaminated with PCBs.

In the mid-2000s, the EPA added the Ward Site to its National Priorities List and initiated a costly removal action. Consolidated Coal Company ("Consol") and PCS Phosphate Company, Inc. ("PCS") have borne much of that removal cost. They filed a complaint under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") against Georgia Power, contending that, as supplier of some of the transformers to Ward, it should be liable for a contribution to those costs. The district court granted summary judgment in favor of Georgia Power. For the reasons discussed below, we affirm the judgment of the district court.

16

## I. Background

### A. CERCLA

In 1980, Congress enacted CERCLA in response to the environmental and health risks posed by industrial pollution. Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 559, 602 (2009). "The Act was designed to promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." Id. (quoting Consol. Edison Co. of N.Y. v. UGI Util., Inc., 423 F.3d 90, 94 (2d Cir. 2005)).

CERCLA imposes liability upon four broad categories of "potentially responsible parties" ("PRPs"). Id. at 605, 608. Briefly stated, these categories are (1) owners and operators of a vessel or facility, (2) any person who owned or operated a facility at the time a hazardous substance is disposed, (3) those persons who arrange for disposal or treatment of hazardous substances, and (4) those who accept hazardous substances for transport to disposal or treatment facilities. 42 U.S.C. § 9607(a). The case before us involves the third liability category, often termed the arranger provision, which imposes liability on

> any person who by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration

> vessel owned or operated by another party or entity and containing such hazardous substances.

Id. § 9607(a)(3) (emphasis added). If PRP status is established, a party faces liability under CERCLA for "all costs of removal or remedial action incurred by the United States Government or a State" as well as "any other necessary costs of response incurred by any other person consistent with the national contingency plan." Id. § 9607(a)(4). CERCLA permits a PRP to "seek contribution from any other person who is liable or potentially liable under section 9607(a)." Id. § 9613(f)(1).[1]

## B. The Ward Site

Ward operated a business in which it purchased used, obsolete, or damaged electrical transformers and reconditioned or repaired them for resale. These types of transformers "step down" the voltage of electricity as it moves from power plants to end users. The particular type of electrical transformer at issue here typically contains an enclosed, vacuum-sealed external tank, an internal iron core, and coils consisting of copper or aluminum windings wrapped in cellulose insulation that tightly surround the core. These internal parts must be

---

[1] Though PCBs have been banned since 1979, the EPA continues to employ CERCLA in an effort to clean PCB-contaminated sites. See, e.g., NCR Corp. v. George A. Whiting Paper Co., 768 F.3d 682, 688-89 (7th Cir. 2014); Fla. Power & Light Co. v. Allis Chalmers Corp., 893 F.2d 1313, 1315 (11th Cir. 1990).

18

immersed in oil to work properly, and often the insulating oil contained PCBs.

Ward left some of the transformers it purchased on an outside lot. When Ward received an order, it would then select a transformer from the lot and recondition or rebuild it to the customer's specifications. This process ranged from cleaning, testing and painting a transformer, to rebuilding it entirely by draining any remaining oil and removing the inner components by crane to perform work on the core and coils.

Given the sometimes significant work Ward performed on transformers, some oil spills occurred at the Ward Site.[2] Because of PCB contamination, the EPA added the Ward Site to its National Priorities List. In 2004 the EPA formally initiated a time-critical removal action, during which workers have removed over 400,000 tons of contaminated soil.

---

[2] Georgia Power disputes that contamination occurred after 1979, during the years at issue here. Ward witnesses testified that they believed contamination occurred before the early 1980s because, in approximately 1978, Ward implemented strict policies and procedures regarding handling of transformers and transformer oil. The district court, however, made no factual finding on this issue. Taking the evidence in the light most favorable to Consol and PCS, we assume that some contamination continued at the Ward Site through the period at issue in this case.

## C. The Georgia Power Transformers

When Georgia Power ceased using transformers, it sent them to its own repair facility. There, Georgia Power inspected each used transformer and designated it either for repair and reuse within the company or for disposal in a commercially reasonable manner. A 1974 Georgia Power bulletin provided procedures "for disposing of surplus, obsolete or damaged distribution line transformers." (J.A. 1329.) The bulletin refers to the disposition of retired transformers as "scrapping," but clarifies that scrapped transformers are "actually sold." (Id. at 1331 (providing instructions for "[w]hen transformers are scrapped, (actually sold)").) The "Scrapping Procedure" instructs Georgia Power employees to "conclude the disposal of the transformers to the best advantage of the company." (Id.)

Because PCBs are regulated by the Toxic Substances Control Act of 1976 ("TSCA"), Georgia Power had to adjust procedures after the passage of that Act. Georgia Power began testing surplus transformers for PCB concentration, with the resulting concentration dictating what course Georgia Power pursued with regard to a transformer. The TSCA prohibited Georgia Power from selling transformers with PCB concentrations at 50 parts per million ("ppm") or more for continued use or rebuilding. Georgia Power therefore sent those transformers to TSCA-licensed

20

smelters.   Transformers with less than 50 ppm were either repaired for reuse by the company or sold at auction.

Georgia Power transferred the transformers designated for sale to its Salvage Department, also known as the Investment Recovery department.  Before sale, Georgia Power usually removed the free-flowing oil from the transformers through a double-pumping procedure.  This process removed all oil from the transformers except a thin sheen coating the inside of the transformers and the cores and coils.[3]

Moisture from the atmosphere can cause damage to the internal components of an exposed transformer lacking oil. "[M]oisture [to a transformer] is basically like cancer to a person." (Id. at 2211.)  Georgia Power, nonetheless, sometimes kept surplus drained transformers uncapped and exposed to moisture prior to sale.

Georgia Power sold used transformers in lots to the highest bidder at auction.  Buyers placed bids on a per kilovolt-ampere basis ("KVA," a measure of transformer capacity) for the entire lot.  The winning bidder could inspect the transformers and reject any lots or, in some cases, individual units that it did

---

[3] The removed PCB-contaminated oil was disposed of by third-party contractors, sold to TSCA-authorized boiler facilities, or burned in Georgia Power's TSCA-authorized generating plant.  Oil with less than 10 ppm was reclaimed for reuse, and oil with 10 to 49 ppm was sold as a secondary fuel.  There is no issue as to the disposition of this removed oil.

not wish to purchase. Georgia Power guaranteed title to the transformers to the buyer, but made no other warranties.

From September 1983 to October 1984, Ward successfully bid upon and purchased 101 Georgia Power transformers at four separate auctions. Ward bid on other lots of transformers that it did not win and on one occasion opted to take possession of only 11 transformers despite winning a lot that contained 18. Of the transformers that Ward purchased, Georgia Power designated approximately 20 as "scrap," indicating that they needed repair. Ward records identify the same transformers and at least 20 others as "FAULTY," which indicated an electrical defect due to a short, bad wiring, or some other problem. (Id. at 2215, 2219, 2222-23.)[4] Georgia Power drained the majority of the transformers prior to transfer, but it left the oil in 14 of the 101 transformers. These undrained units all had PCB concentrations between 0 and 50 ppm, except one that had a concentration of 488 ppm. Ward's records indicate that one of the drained transformers still had "about 5 gals" of 17.4 ppm PCB oil in it four years after arriving at Ward. (Id. at 2225.) Ward replaced the five gallons with new oil.

---

[4] A portion of Consol's and PCS' evidence stems from an affidavit that Georgia Power moved to strike. The district court assumed admissibility and denied the motion to strike as moot after granting summary judgment. (Id. at 3405.) For our analysis, we likewise assume that the evidence was admissible.

For the 101 transformers it purchased, Ward paid from $0.77 to $3.21 per KVA for 43 units. For another 31 units, the lot prices ranged from $1.11 to $1.18 per KVA. And for the final 27 transformers, Ward paid from $1.74 to $2.16 per KVA. Because transformers typically contain thousands of pounds of metals, even broken transformers remained valuable.[5]

Ward sold all 101 transformers it purchased from Georgia Power to third parties as working transformers. It "rebuilt" 80 of the transformers prior to sale. "[I]n most cases," this involved "untank[ing] the transformer and do[ing] some work to the coils, whether [it was] reconnecting or rewinding part of it." (Id. 1046; 3267-68.) None of the Georgia Power transformers was sold for scrap.

### D. Savannah Electric Transformers

In 1980, Savannah Electric and Power Company ("Savannah Electric") sold 20 transformers at auction to Electric Equipment

---

[5] The record provides sparse evidence from which to give any context to these per-KVA values. Richard Westover, who defendants below disclosed as an expert in used electrical equipment, testified that a sale at $3.00 per KVA would tend to indicate that the transformers were functional, whereas a sale around $1.00 per KVA suggests that the parties "obviously knew that these were non-working transformers." (Id. at 1280-81.) The Plaintiffs' Joint Statement of Material Facts, filed below, claims that the $1.00 per KVA price for a broken transformer is "to account for the value of the raw materials inside." (Id. at 2229.) However, it is unclear from the record to what extent, if any, the raw materials or any other factor might contribute to that value.

Company of New York ("EECNY"). EECNY then shipped these units to Ward for storage until it or Ward could find a third-party buyer. In 2006, Savannah Electric merged with Georgia Power with Georgia Power as the surviving entity.

When it sold the transformers to EENCY, Savannah Electric was updating its inventory of transformers by selling and replacing those that contained PCBs. To accomplish that goal it sold transformers that "were in good shape" that it "just had no use for." (Id. at 2231.)

The 20 transformers that Savannah Electric sold to EECNY thus were in "perfectly good working order." (Id. at 2233.) These transformers "had been in service and were simply de-energized and sold with no record of any problems or defects." (Id.) All the units sold contained oil, with some level of PCB concentration. Ward performed work on some of the units to alter obsolete voltage configurations to meet the demands of certain prospective purchasers. Ward sold three units as "COMPLETELY REBUILT" with changed voltages, having opened the transformers to rewind the coils. (Id. at 2234-35, 2456.) Ward labeled three other transformers as "REBUILT AND GUARANTEED," after baking out their coils and doing other work. (Id. at 2235-36, 2438.) However, all 20 transformers were functioning units that could have been used without alteration by a third-party purchaser with a matching KVA need.

24

Ward sold each of the 20 Savannah Electric transformers as well as the 101 Georgia Power transformers. The available records show that Ward sold the transformers for more than it had paid and expended varying degrees of resources on those transformers before sale.

## E. Relevant Proceedings Below

In 2005, Duke Energy Progress, Inc. ("Progress," f/k/a Carolina Power & Light Company) and Consol entered into an administrative settlement with the EPA, in which they agreed to perform removal actions at the Ward Site and to reimburse the EPA for removal costs. PCS later entered a trust agreement with Progress and Consol and contributed toward the costs of the Ward cleanup. Consol and PCS have each paid more than $17 million in cleanup costs related to the Ward Site.

In 2008 and 2009, Consol and Progress filed complaints in the U.S. District Court for the Eastern District of North Carolina against Georgia Power, PCS, and a number of other defendants seeking contribution for response costs under CERCLA. See 42 U.S.C. § 9613(f). The district court consolidated the suits into two cases, one with Consol as plaintiff and one with Progress as plaintiff. PCS counterclaimed against Consol and Progress, and it cross-claimed for CERCLA contribution against the other defendants, including Georgia Power. Consol,

25

Progress, and PCS alleged that Georgia Power "arranged for disposal . . . of" PCBs through its sales of used transformers to Ward and was liable for the Savannah Electric transformers as the successor in interest to that entity. Id. § 9607(a)(3).

The parties proceeded via a test case method, in which one defendant who had sold transformers to Ward and one defendant who had transformers repaired by Ward volunteered to litigate their respective liability, with discovery stayed for all other parties. The district court bifurcated the proceedings into two phases: the first to determine liability under CERCLA and, if necessary, the second to allocate damages. Georgia Power volunteered to be the test case for a selling defendant.

After discovery, Georgia Power moved for summary judgment. The district court granted the motion, finding that Georgia Power had "show[n] it did not have the necessary intent to create arranger liability under CERCLA." Carolina Power & Light Co. v. Alcan Aluminum Corp. (CP&L), 921 F. Supp. 2d 488, 499 (E.D.N.C. 2013). The court emphasized that the used transformers were useful, valuable products from which Ward was able to "mak[e] thousands of dollars more than what [it] paid Georgia Power." Id. at 488. At Consol's and PCS' request, the court entered final judgment on the claims against Georgia Power.

Consol and PCS timely appealed, and we consolidated the appeals into the present case. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## II. Discussion

Consol and PCS argue that the district court improperly focused on the overall value of the used transformers and Ward's ability to profit from their resell. This, they contend, overlooks the possibility that Georgia Power had a dual intent: to gain revenue from the sales and to arrange for the disposal of PCBs. Georgia Power counters that it intended only to engage in legitimate sale transactions in a competitive market and that nothing in the record suggests its intent to dispose of PCBs.

We review de novo the district court's determination of PRP status under CERCLA and grant of summary judgment. PCS Nitrogen Inc. v. Ashley II of Charleston LLC, 714 F.3d 161, 172 (4th Cir. 2013). In doing so, we construe all facts and reasonable inference in favor of the non-moving parties, which here are Consol and PCS. Turner v. United States, 736 F.3d 274, 280 (4th Cir. 2013).

### A. CERCLA Arranger Liability

What qualifies as "arranging for disposal" under CERCLA "is clear at the margins but murky in the middle." NCR Corp., 768 F.3d at 704. At one extreme, liability plainly attaches if an

27

entity enters a transaction "for the sole purpose of discarding a used and no longer useful hazardous substance."  Burlington, 556 U.S. at 610.  On the other extreme, there is no liability "merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination."  Id. "[B]etween these two extremes" are arrangements where "the seller has some knowledge of the buyers' planned disposal or whose motives for the 'sale' of hazardous substances are less than clear."  Id.  In those cases, the court must undertake a "fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a 'disposal' or a 'sale.'"  Id.

In Burlington, the Supreme Court considered whether Shell Oil had arranged for disposal of pesticides and other chemical products by shipping them to a wholesale distributor "under conditions it knew would result in the spilling of a portion of the hazardous substance by the purchaser or common carrier."  Id. at 612.  The government contended that the phrase "arranged for disposal" should be interpreted broadly, based on the definition of the statutory term "disposal."[6]  Id. at 611.  In

---

[6]  CERCLA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that (Continued)

28

the government's view, Congress had included "unintentional acts such as 'spilling' and 'leaking' in the definition of disposal" because it intended to impose liability when entities "engage in legitimate sales of hazardous substances knowing that some disposal may occur as a collateral consequence of the sale itself." Id. at 611-12 (footnote omitted).

The Supreme Court rejected the government's position. To be sure, the Court acknowledged, "in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes." Id. at 612. But the Court further concluded that "knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." Id. at 612. To qualify as an arranger, Shell would have had to sell the chemicals "with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods" within the statutory definition of disposal. Id. at 612. Far from intending for the spills to occur, Shell "took numerous

such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

steps to encourage its distributors to <u>reduce</u> the likelihood of such spills." <u>Id.</u> at 613. Given those circumstances, Shell's "mere knowledge that spills and leaks continued to occur" provided "insufficient grounds" to find that Shell had arranged for a disposal within the meaning of § 9607(a)(3). <u>Id.</u> Thus, for arranger liability to be found, something more is required than mere knowledge "that some disposal may occur as a collateral consequence of the sale itself." <u>Id.</u> at 612.

Prior to <u>Burlington</u>, we identified four factors in <u>Pneumo Abex Corp. v. High Point, Thomasville and Denton Railroad Co.</u> that could be useful in "determining whether a transaction was for the discard of hazardous substances or for the sale of valuable materials":

> [1] the intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused, [2] the value of the materials sold, [3] the usefulness of the materials in the condition in which they were sold, and [4] the state of the product at the time of transferral (was the hazardous material contained or leaking/ loose).

142 F.3d 769, 775 (4th Cir. 1998). We also recognized that there was "no bright line" and that "[a] party's responsibility . . . must by necessity turn on a fact-specific inquiry into the nature of the transaction." <u>Id.</u> (internal quotation marks omitted).

In <u>Pneumo Abex</u>, a parts foundry sought contribution for cleanup costs from railroads that shipped used wheel bearings to

30

the foundry and received credit for their weight against the purchase of new bearings.  Id. at 773.  The foundry removed dirt, grease, and impurities from the used bearings and melted the bearings to mold new bearings.  In this process dust and slag was produced, which was dumped in an area that the EPA found to be contaminated.  Id. at 775.

We concluded that the railroads did not arrange for disposal of the wheel bearings, for CERCLA purposes, by sending them to the foundry.  "The intent of both parties to the transaction was that the wheel bearings would be reused in their entirety in the creation of new wheel bearings," not simply disposed of as hazardous metals.  Id.  We likened the case to one "in which a party sells to another a material which becomes hazardous in its use, but is contained when sold."  Id.

Several factors led to that conclusion.  The slag and dust would have been produced "even if virgin materials were used to make the new bearings."  Id.  The dirt and grease were removed "incidental to remolding new bearings," and "were not the hazardous materials, the metals themselves were."  Id.  Also, the foundry paid for the bearings; the railroads did not pay for disposal of unwanted metal.  Id.  In sum, "[t]he parties contemplated that the bearings were a valuable product for which the Foundry paid a competitive price."  Id. at 775-76.

31

Consol and PCS do not contend that the sole or even primary purpose of the sale of the transformers was to dispose of PCBs. On this record, Burlington would foreclose that claim. Instead, Consol and PCS contend Georgia Power and Savannah Electric had a secondary motive for the transformer sale -- to dispose of PCBs -- and that this secondary motive is sufficient to create arranger liability under CERCLA.

In that regard, neither Burlington nor Pneumo Abex foreclose arranger liability as a matter of law based on a secondary intent, at least when there is a sufficient factual basis for such a finding from the necessary "fact intensive and case specific" inquiry. Burlington, 556 U.S. at 610. Nonetheless, a party does not "intend to dispose" of a hazardous substance solely by selling a product to a buyer who at some point down the line disposes of a hazardous substance that was within the product. The Supreme Court made that point quite clear in Burlington. Anytime an entity sells a product that contains a hazardous substance, it also "intends" to rid itself of that hazardous substance in some metaphysical sense. But intent to sell a product that happens to contain a hazardous substance is not equivalent to intent to dispose of a hazardous substance under CERCLA. For arranger liability to attach, there must be something more.

32

The something more could be the seller's "intentional steps," beyond what is inherent to the sale, to dispose of the hazardous waste. <u>Id.</u> at 611. Or other evidence might demonstrate that the seller "entered into the sale . . . with the intention that at least a portion of the [hazardous] product be disposed of" as defined in the act -- by discharge, deposit, injection, dumping, spilling, leaking, or placing it into or on any land or water. <u>Id.</u> at 612. This is the "fact-intensive inquiry that looks beyond the parties' characterization," <u>id.</u> at 610, and "into the nature of the transaction," <u>Pneumo Abex</u>, 142 F.3d at 775 (internal quotation marks omitted). With that framework in mind, we turn to the circumstances of transformer sales by Georgia Power and Savannah Electric.

## B. Georgia Power Transformers

Consol and PCS fail to establish a material issue of fact in dispute as to Georgia Power's intent to arrange for the disposal of PCBs in the 101 transformers it sold to Ward. There is no direct evidence that Georgia Power intended, even in part, to arrange for the disposal of PCBs through these transactions. Nor is there circumstantial evidence from which a reasonable juror could infer that Georgia Power so intended.

33

## 1. Direct Evidence

Consol and PCS have pointed to no direct evidence that Georgia Power auctioned its transformers to Ward intending to dispose of the contained PCBs. What direct evidence does exist of Georgia Power's subjective intent reflects only that it wished to sell its used transformers "to the best advantage of the company" -- to recover revenue. (J.A. 1331.) Although Georgia Power's procedures for offloading transformers refer to "scrapping," and even to "disposal," it is equally clear that, where permitted by the TSCA, Georgia Power meant those terms to reflect that the transformers were "actually sold." (Id.) Georgia Power may have called these sales "disposals" in its 1974 procedures bulletin, but that has limited bearing on its intent to "dispose" of transformers as the word is construed in CERCLA, let alone the PCBs within those transformers.

Consol and PCS argue that Georgia Power's PCB testing procedure for used transformers -- first testing the PCB concentrations and then processing the transformers differently based on the result -- proves that one overall goal was to dispose of PCBs. The procedure, however, merely demonstrates Georgia Power's intent to comply with the TSCA, the federal waste statute that compels a differential process based on products with PCB levels above or below 50 ppm. Georgia Power legitimately sought to sell used transformers to its greatest

commercial advantage, and the TSCA circumscribed how Georgia Power went about accomplishing that goal. Compliance with the TSCA does not create a backdoor arranger liability factor under CERCLA.

In Burlington, the Supreme Court noted "the indispensable role that state of mind must play in determining whether a party has otherwise arranged for disposal . . . of hazardous substances." 556 U.S. at 611 (internal quotation marks omitted) (quoting with approval United States v. Cello-Foil Prods., Inc., 100 F.3d 1227, 1231 (6th Cir. 1996)). The record before us does not contain any direct evidence that Georgia Power's "state of mind" in selling the transformers was to "dispose" of PCBs.

## 2. Circumstantial Evidence

The circumstantial evidence surrounding Georgia Power's transformers sales also fails to create a material issue of fact as to Georgia Power's intent in selling the transformers. Consol and PCS argue that intent to dispose of the PCBs is evident from the nature of the sales. For example, they contend that some transformers were drained of oil and non-functional, exposed to damaging moisture, or sold in lots at low prices. However, the circumstances of the sales, viewed through the lens of Burlington and supported by the Pneumo Abex factors, do not support arranger liability in this case. The record reflects

35

the position of Consol and PCS rests on speculation, not a dispute over a genuine issue of material fact.

### a) Intent for Reuse

The first Pneumo Abex factor asks whether the parties intended for "the materials . . . to be reused entirely or reclaimed and then reused." 142 F.3d at 775. Consol and PCS argue that the PCB-contaminated oil and parts were "worthless accouterments" to the transformer shells that Ward really wanted. (Appellant's Br. 39.) Georgia Power, focusing on the overall product, responds that Ward commercially reused all of the transformers, selling them to third-party buyers and usually for a profit.

Much of the parties' disagreement as to this and the remaining Pneumo Abex factors turns on whether the court should apply the factors with respect to the overall product (the transformers) or only the hazardous material contained within, ignoring all other circumstances of the transaction. Where, as here, the hazardous materials are part of the overall product, a court may consider whether those materials were necessary to the sale, or instead, could and should have been separated. As we noted in Pneumo Abex, if the hazardous materials are an "incidental" component of a legitimate sale, then their inclusion in the transaction may well demonstrate nothing more

36

than the seller's intent to complete the sale of the overall product. Pneumo Abex, 142 F.3d at 775-76 (no arranger liability for returning wheel bearings containing valuable but hazardous metal that was molded into new bearings); see also, e.g., NCR Corp., 768 F.3d at 688, 707 (no arranger liability for a paper company who sold paper scraps containing PCBs to a recycling plant, where the PCBs were released only once the plant processed the valuable scraps into usable fibers).

On the other hand, if the hazardous material could practicably have been excluded from the sale, that may suggest the seller entered the transaction with a further intent to arrange for a disposal. See, e.g., Cello-Foil, 100 F.3d at 1230 (recognizing an issue of fact as to arranger liability and reversing a grant of summary judgment where a solvent purchaser returned reusable drums to recover a deposit but in some cases left in the drums "unused solvents of up to fifteen gallons"). For these reasons, the proper focus of the Pneumo Abex analysis -- the overall product or a particular material within -- will likely depend on the product's construction. If the hazardous materials are easily separable from the overall product, such as a battery in a toy, it may generally be appropriate to direct the Pneumo Abex inquiry toward those materials. But if separation is impractical, like a coat of paint on the toy, it

37

will make more sense to direct the inquiry toward the overall product.

At the product level in this case, there is no dispute that Ward, the purchaser, intended to reuse the transformers to the greatest extent possible, including as whole units. Ward was in the repair and resale business; it did not operate a disposal facility. The record does not establish that Ward purchased the transformers to resell for scrap. Nor does the record establish that the parties had any divergent intent for how Ward would handle the PCB-containing oil and oil-soaked parts. The evidence, such as it is, simply does not support an inference that either of the parties entered into the sale of the transformers with the intent that Ward would replace the oil or any oil-soaked parts as a matter of course.

Ward's later decision not to reuse the PCB oil and oil-coated parts in some transformers does not imply that Georgia Power had an intent to dispose of the oil when selling the transformers. Third-party customer specifications, which directed Ward's profit motive, dictated how Ward chose to process the transformers. While some of the former Georgia Power transformers might be sold "as is, where is" to a third-party for a reasonable commercial return, others might be sold for a higher profit to a customer only after repair or retooling

38

depending on that customer's need. None of that connects to a disposal intent for oil on the part of Georgia Power.

Any disposal of PCBs occurred only as a result of Ward's later business judgments, not any implicit agreement or understanding between Ward and Georgia Power at the time of auction. Nothing in the record reflects to the contrary. See NCR Corp., 768 F.3d at 706 (observing that the purchaser had multiple options for handling the hazardous byproduct it produced; that the seller "neither contracted with them to take that step, nor did it have any control over what the [purchaser] ultimately did"; and that this "lack of control" was "a good reason to find [the seller] was not arranging for disposal"); Pneumo Abex, 142 F.3d at 775 (observing that the "removal of contaminants was not the purpose of the transaction"; the foundry processed the wheel bearing because they were "worn out or broken"). Here, Georgia Power lacked knowledge of or control over what Ward chose to do with the transformers Ward acquired. Even more, Georgia Power did not know whether and to what extent Ward would reuse the PCB-contaminated oil and parts in any transformers it determined to rebuild or retool.

Other than speculation on the part of the appellants, there is no record basis to conclude that when Georgia Power sold the transformers to Ward, either party had any intent that the transformers be scrapped or sold for parts as reclaimed

39

materials as opposed to "reused entirely."  Thus, we find no error in the district court's implicit conclusion that the first Pneumo Abex factor weighs in Georgia Power's favor based on its "fact-intensive and case-specific" inquiry.[7]

### b) *Value*

Pneumo Abex also advises courts to consider "the value of the materials sold."  Id.  Consol and PCS argue that the transformers had value "despite the tainted residual oil, not because of it."  (Appellant's Br. 40.)  Georgia Power emphasizes, as the district court did, that the transformers had real commercial value, for which Ward paid a "competitive price" and later sold them all for profit.  See CP&L, 921 F. Supp. 2d at 500.

The record confirms that Georgia Power recovered revenue in excess of scrap value from the sales, and that Ward profited from the resale of the transformers.  Ward purchased the transformers at competitive auctions, sometimes losing units to

---

[7] Consol and PCS argue that the district court's failure to expressly state its resolution of the first Pneumo Abex factor is a fatal error that requires vacation of the judgment.  We find the district court's resolution of this factor to be sufficiently clear from its remaining analysis, and in any event, Pneumo Abex merely highlights some factors that courts "focus on" in carrying out the arranger liability inquiry.  142 F.3d at 775.  The result of the inquiry is not contingent on any single factor.

higher bids.  Cf. Pneumo Abex, 142 F.3d at 775-76 ("The parties contemplated that the bearings were a valuable product for which the Foundry paid a competitive price.").  This is not a case where the parties entered an "idiosyncratic" transaction for a substance for which there was no "general demand."  United States v. Gen. Elec. Co., 670 F.3d 377, 386 (1st Cir. 2012) ("[T]he lack of a viable market for scrap Pyranol during the relevant period supplies further proof that GE did not view scrap Pyranol as a legitimate and serviceable product.").  In the district court' words, "Ward was able to resell most or all of the transformers that it purchased from Georgia Power, after reconditioning and/or reconfiguration, making thousands of dollars more than what Ward paid Georgia Power, on resale." CP&L, 921 F. Supp. 2d at 498.  That Ward repaired or rebuilt some of the transformers was simply its business model and the used transformers were, in essence, its raw materials. "Clearly, the transformers that Georgia Power sold to Ward had marketable value."  Id.

The record does not support the conclusion that the presence of PCB-contaminated oil and parts depressed the transformers' value.  Consol and PCS present no evidence that Ward paid less for transformers based on PCBs, which could have suggested Georgia Power's intent to "contract[] away [its] responsibility" to dispose.  Fla. Power & Light Co., 893 F.2d at

41

1318 (internal quotation marks omitted); see also Pneumo Abex, 142 F.3d at 775 ("The Foundry paid the appellants for the bearings; the appellants did not pay the Foundry to dispose of unwanted metal."). The undrained transformers would not have been functional without the oil and oil-coated parts, and a functional transformer is intuitively more valuable than a nonfunctional transformer. Georgia Power's decision to not render these transformers inoperable can hardly be evidence that Georgia Power intended to dispose of PCBs. For the drained transformers, the evidence does not show that a residual PCB oil sheen created increased costs for Ward during the repair and rebuilding processes or, as noted above, affected the auction price. In short, there is no basis in the record to isolate a negative value for the PCB-contaminated oil and parts from the unquestionably positive commercial value of the transformers.

Consol and PCS argue that certain factors relating to the sales -- that Georgia Power sold the transformers in lots, allowed some of the coils to be exposed to moisture, and provided no warranties except as to title -- reflect an intent to simply scrap the transformers to get rid of the PCBs in the oil. But Consol and PCS adduced no evidence that such sale factors had any relationship to a decision to dispose of PCBs and were not ordinary commercial terms of sale. The value of the transformers was in their ability to be resold to meet

42

third-party customers' orders. Cf. NCR Corp., 768 F.3d at 704 ("Purchasing this product was essential to the recycling mills' business operations, and they must take the bitter with the sweet of operating in that market."). There simply is not evidence in the record supporting the argument by Consol and PCS that the auctions were, even in part, an intended PCB disposal arrangement. Accordingly, the district court's determination as to the Pneumo Abex "value" factor is well supported.

### c) Usefulness

The third Pneumo Abex factor considers "the usefulness of the materials in the condition in which they were sold." 142 F.3d at 775. Consol and PCS argue that the residual oil "could not by itself cool a transformer" and was "undesirable to use in rebuilt transformers." (Appellant's Br. 43.) Georgia Power, again, focuses on the transformers and highlights the district court's conclusion that "all or most continued to be used as transformers after their sale because they had not reached the end of their useful lives." CP&L, 921 F. Supp. 2d at 489.

The PCB content thus does not appear to have factored into the continued usefulness of the auctioned transformers. Consol and PCS say that some materials in some transformers were discarded, but not that they had to be. Georgia Power did not auction all of the used transformers that regulations permitted

43

it to sell; some it reconditioned and retained itself. That decision was based not on PCB content, but on age, obsolescence, the need for additional stock of the particular transformer type, and the nature and extent of any needed repairs. (J.A. 2201.)

Once Ward acquired the transformers, the record does not show that Ward was required or necessarily had to remove residual oil or oil sheen containing the PCBs. Customer specifications dictated how Ward processed the transformers, and it was able to process all of them for sale. Again, we find no error in the district court's application of this Pneumo Abex factor.

### d) *State at the Time of Transfer*

Finally, the fourth Pneumo Abex factor addresses "the state of the product at the time of transferral," and particularly whether the "hazardous material [was] contained or leaking/ loose." 142 F.3d at 775. Consol and PCS acknowledge that the transformers were not leaking, but conjecture that the condition of some of the transformers at the time of transfer was equivalent to a leaking transformer. The record, however, shows that, as in Pneumo Abex, this is a case "in which a party sells to another a material which becomes hazardous in its use, but is contained when sold." Id.

44

There is no evidence that any form of "disposal" under CERCLA occurred during the transformers' transfer from Georgia Power to Ward. None of the undrained transformers were leaking oil at the time of sale because they were capped. CP&L, 921 F. Supp. 2d at 498. Nor is there any record evidence that the drained transformers leaked or spilled in conjunction with the sale transfer. As the district court found, allegations relating to the condition of the transformers do not "amount to leaking at the time of sale." Id. at 498-99. Absent leaks or some similar disposal of hazardous substances during the transfer, this factor does not indicate Georgia Power's intent to arrange for a disposal. See Pneumo Abex, 142 F.3d at 775 (noting that the hazardous metals "were in a contained form when delivered for sale"). The district court did not err in concluding that the fourth Pneumo Abex factor weighed in favor of Georgia Power.

### e) Knowledge

Finally, relying on Burlington, Consol and PCS argue that Georgia Power's intent to dispose can be inferred from its knowledge that Ward could spill PCBs while rebuilding the transformers. The district court observed that knowledge alone was insufficient for liability "where all other factors counsel toward a finding that Georgia Power lacked the requisite intent

45

for arranger liability." CP&L, 921 F. Supp. 2d at 499 (citing Burlington, 556 U.S. at 612 ("[K]nowledge alone is insufficient to prove that an entity 'planned for' the disposal[.]")). The district court noted that, at any rate, the "knowledge" Consol and PCS allege was "merely about Georgia Power's general expertise in dealing with transformers and PCB-laden oils, and not any knowledge as to spills at Ward." Id. at 499. Nothing in the record contradicts that determination or the view that Ward "unbeknownst to the seller, disposed of the product in a way that led to contamination." Burlington, 556 U.S. at 610.

In some respects, Georgia Power appears even less culpable than Shell Oil in Burlington, which apparently had some knowledge "that some disposal may occur as a collateral consequence of the sale itself." Id. at 612. Shell Oil was nonetheless found not to have sufficient intent for arranger liability. In contrast, the record here shows no knowledge by Georgia Power of the disposition of the transformers (and any PCBs) once acquired by Ward. Given Georgia Power's clear intent to sell a valuable product on a competitive market, and its lack of specific knowledge regarding how Ward would process the transformers, the "knowledge" factor is of no aid to Consol and PCS.

In sum, Consol and PCS fail under Burlington to adduce record evidence creating any genuine issue of material fact as

46

to whether Georgia Power sold the transformers "with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods" within the statutory definition of disposal. 556 U.S. at 612. The Pneumo Abex factors, whether examined individually or holistically, also favor Georgia Power. Given the district court's "fact-intensive and case-specific" analysis, we find no error in its award of summary judgment in favor of Georgia Power on this issue.

### C. Savannah Electric Transformers

Applying the same analysis, we find the circumstances as to the sale of the Savannah Electric transformers fall squarely on the side of a legitimate sale and against arranger liability. The 20 Savannah Electric transformers were in "perfectly good working order" and "were simply de-energized and sold with no record of any problems or defects." (Id. at 2233.) The record appears to reflect that the Savannah Electric transformers were operational at the time of sale and could have been used without adjustment if they fit a particular customer's KVA requirements. The record evidence indicates only that Savannah Electric intended for the transformers to be reused entirely (factor 1); that the transformers retained significant value (factor 2); that the transformers were in a useful condition (factor 3); and

47

that they were not leaking (factor 4). While Ward opted to rebuild some of the transformers, that decision was made to meet customer orders and reveals nothing about Savannah Electric's intent at the time of the original sale.

On this record, the Pneumo Abex factors counsel against arranger liability and do not support the inference that Savannah Electric's intent was to dispose of PCBs. Accordingly, the district court did not err in awarding summary judgment to Georgia Power.

## III.

For the foregoing reasons, we find that the circumstances of the transformer sales by Georgia Power and Savannah Electric do not indicate the intent to dispose of PCBs and therefore do not support arranger liability. The judgment of the district court is

AFFIRMED.

WYNN, Circuit Judge, dissenting.

In 1983 and 1984, Georgia Power Company ("Georgia Power") sold Ward Transformer Company ("Ward Transformer") over one hundred electrical transformers at "scrapping" auctions. The used transformers were in various stages of disrepair and contained varying amounts of oil tainted with polychlorinated biphenyls ("PCBs")—potent human carcinogens "linked to skin cancer, liver cancer, brain cancer, intestinal cancer, bladder cancer, leukemia, birth defects in humans and animals, and other health problems." United States v. Gen. Elec. Co., 670 F.3d 377, 379 n.1 (1st Cir. 2012). Georgia Power knew that to function as transformers again, its broken and obsolete transformers would have to be opened and repaired, and toxic oil-saturated parts replaced.

Ward Transformer's rebuilding and refurbishment of the transformers it purchased "inevitably" resulted in the disposal of PCBs at its facility. Carolina Power & Light Co. v. Alcan Aluminum Corp., 921 F. Supp. 2d 488, 494 n.14 (E.D.N.C. 2013). Since 2005, over 400,000 tons of soil have been removed from the Ward Transformer site and millions of dollars expended to mitigate the contamination wrought by PCB-laden oil.

A party who arranges the disposal of hazardous materials may be liable for response costs under the Comprehensive Environmental Response, Compensation, and Liability Act

49

("CERCLA"). The Supreme Court recently made clear that intent is central to the question of arranger liability. Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 609–13 (2009). This Court has long made equally clear that "subjective states and objective manifestations of intention present interpretive issues traditionally understood to be for the trier of fact." Charbonnages de France v. Smith, 597 F.2d 406, 415 (4th Cir. 1979) (reversing summary judgment where intent was at issue).

At the heart of this CERCLA case, then, is Georgia Power's intent. Today the majority holds as a matter of law that a power company who, in its own words, "dispose[s] of" "scrap[]" electrical transformers known to contain varying levels of hazardous substances does not intend even in part to "dispose of" hazardous substances within the meaning of CERCLA. Viewing the evidence in the light most favorable to the non-moving parties, as we must on summary judgment, however, a rational finder of fact could conclude otherwise.

I.

Congress enacted CERCLA in 1980 "in response to the serious environmental and health risks posed by industrial pollution." Burlington Northern, 556 U.S. at 602. At the time, Congress was confronting a "legacy of past haphazard disposal of chemical

50

wastes and the continuing danger of spills" which posed what some called "the most serious health and environmental challenge of the decade." Alexandra B. Klass, From Reservoirs to Remediation: The Impact of CERCLA on Common Law Strict Liability Environmental Claims, 39 Wake Forest L. Rev. 903, 927 (2004) (citing Report of the Comm. on Env't and Pub. Works, S. Rep. No. 96-848, at 2 (2d Sess. 1980)). Among the hazardous substances being improperly disposed of at the time were PCBs.

By enacting CERCLA, Congress sought to provide "a mechanism for clean up of sites polluted with hazardous waste" as well as "a mechanism by which a governmental entity or private party may recover the cost of clean up from all parties responsible for the pollution of the site." Pneumo Abex Corp. v. High Point, Thomasville & Denton R. Co., 142 F.3d 769, 774 (4th Cir. 1998) (citing 42 U.S.C. § 9607; 42 U.S.C. § 9613(f)) (emphasis added).

As courts have repeatedly emphasized, CERCLA is a remedial statute and thus "must be given a broad interpretation to effect its ameliorative goals." First United Methodist Church of Hyattsville v. U.S. Gypsum Co., 882 F.2d 862, 867 (4th Cir. 1989); see also B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir. 1992) (stating that because CERCLA is a remedial statute, it must be "construed liberally" to achieve its purpose). This remains true even if faithful application of CERCLA may, at times, yield seemingly harsh results. Cf. Matter

51

of Bell Petroleum Servs., Inc., 3 F.3d 889, 897 (5th Cir. 1993) (noting that, under CERCLA liability is "[o]ften . . . imposed upon entities for conduct predating the enactment of CERCLA, and even for conduct that was not illegal, unethical, or immoral at the time it occurred.") (citations omitted).

With that background in mind, I turn to the CERCLA provision at issue here.

## II.

### A.

Central to this case is CERCLA's arranger liability provision. Specifically, among the "covered persons" liable under CERCLA for recovery costs are persons who "arranged for the disposal . . . of hazardous substances." 42 U.S.C. § 9607(a)(3). "[A]rranger liability was intended to deter and, if necessary, to sanction parties seeking to evade liability by 'contracting away' responsibility." Gen. Elec. Co., 670 F.3d at 382. Arranger liability thus "ensures that owners of hazardous substances may not free themselves from liability by selling or otherwise transferring a hazardous substance to another party for the purpose of disposal." Team Enters., LLC v. W. Inv. Real Estate Trust, 647 F.3d 901, 907 (9th Cir. 2011).

CERCLA does not define "arrange." In Burlington Northern, the Supreme Court held some amount of intent inheres in the word

52

"arrange" and that an arranger must therefore intend, at least in part, to dispose of a hazardous substance for CERCLA liability to attach. Arranger liability thus turns on a fact-sensitive analysis of the defendant's state-of mind—a type of analysis rarely appropriate for summary judgment. See Charbonnages, 597 F.2d at 415. Not surprisingly, then, Burlington Northern was the product of a trial—a six-week bench trial culminating in "507 separate findings of fact and conclusions of law." 556 U.S. at 605. On appeal, the Ninth Circuit recognized that "disposal of hazardous wastes" was "not the purpose" of Shell Oil's transactions. Id. at 606-07 (emphasis added). Nevertheless, the court affirmed the trial courts holding of arranger liability. The Supreme Court reversed, holding that to qualify as an arranger under CERCLA, the party must have intended, at least in part, to dispose of hazardous substances. Id.

In reaching this conclusion, the Supreme Court relied on United States v. Cello-Foil Prods., Inc., for the proposition that "'state of mind'" plays an "'indispensable role'" in determining whether a party qualifies as an arranger. Burlington Northern, 556 U.S. at 611 (quoting 100 F.3d 1227, 1231 (6th Cir. 1996)). In light of the Supreme Court's favorable citation to Cello-Foil, this case is worth examining in some detail.

53

In *Cello-Foil*, a solvent company shipped solvents in re-usable drums, charging customers a deposit that would be refunded upon the drums' return. 100 F.3d at 1230. Many customers returned drums with residual amounts of solvent inside. Id. "Some of the drums' contents had been emptied as much as possible, some had been refilled with water, and some contained unused solvents of up to fifteen gallons." Id. In most cases, the solvent company would simply pour any remaining contents of the drums onto the ground. Id. But nothing indicated that the customers knew how the solvent company handled residual solvents left in the drums.

The government brought an action to recover response costs from several solvent purchasers, alleging that they had "arranged for" the disposal of hazardous substances when they returned their drums in exchange for the deposit. Id. The district court granted summary judgment to the solvent purchasers, stating that "the purpose of Defendants' returning of the drums was to recover the deposits that Defendants had paid; the Government has absolutely no proof that Defendants' purpose was to dispose of residual amounts of hazardous substances remaining in those drums." Id. at 1233. The Sixth Circuit reversed, finding a genuine issue of material fact as to whether the customers faced arranger liability under CERCLA. Id. at 1230.

54

Notably, in concluding that the district court "acted too hastily in finding no showing of intent [as a matter of law]," the court cited Fourth Circuit precedent counseling that "issues regarding parties' intent . . . 'present interpretive issues traditionally understood to be for the trier of fact.'" Id. at 1234 (quoting Charbonnages, 597 F.2d at 415). Even though, in the eyes of the court, the customers' primary purpose in returning the drums was to recover their deposits, the Sixth Circuit nonetheless found that a reasonable factfinder could infer that a "further purpose was to dispose of the residual wastes returned with the drums." Id. at 1233.

B.

Rather than heed the advice of Cello-Foil and defer resolving the question of intent until after trial, the majority concludes that no reasonable finder of fact could infer that Georgia Power intended to "dispose of" PCB-tainted oil within the meaning of CERCLA when it, in its own words, "disposed of" and "scrapp[ed]" its "surplus, obsolete or damaged" transformers by auctioning them off with varying amounts of PCB-tainted oil inside. J.A. 1331, 1329. In reviewing Georgia Power's motion for summary judgment, we are bound to view the facts in the light most favorable to Appellants PCS Phosphate Company ("PCS") and Consolidation Coal Company ("Consol") and to draw all reasonable inferences in their favor. Garofolo v. Donald B.

Heslep Assocs., Inc., 405 F.3d 194, 198 (4th Cir. 2005). Doing so here, and with an eye to the case law discussed above, leads to the conclusion that Georgia Power's motion for summary judgment should have been denied. Specifically, a reasonable finder of fact could infer from the record evidence that Georgia Power sold its used transformers not just for economic gain but also for the purpose of disposing of the PCBs contained therein.

Many of the transformers at issue were nothing more than "usable carcasses," while others would have to be "completely rebuilt." J.A. 1279. Perhaps not surprisingly, then, Georgia Power left the transformers at issue exposed to the elements, knowing that moisture exposure could cripple the transformers' ability to function. Some of Georgia Power's transformers ended up with an "oil residue & rainwater mixture" inside of them. J.A. 1427. Such moisture to a transformer is "basically like cancer to a person" as it is "the number one cause of failures." J.A. 1250. Georgia Power referred to its sale of the transformers as "scrapping" and "disposing of" them. J.A. 1331. And it sold the transformers with no minimum price and no warranties other than as to title.

Further, while Georgia Power drained some of its transformers of insulating oil, some still contained gallons of oil even after being drained. Indeed, one of the drained transformers had "about 5 [gallons]" of 17.4 parts per million

("ppm") PCB oil in it after arriving at Ward Transformer. Others were not drained at all. J.A. 2225. In fact, though regulations under the Toxic Substances Control Act of 1976 ("TSCA") prohibited Georgia Power from selling transformers containing greater than 50 ppm PCB oil, Ward Transformer's records show that one of Georgia Power's transformers arrived with 488 ppm PCB oil still inside. Significantly, any oil-laden transformers would have to be drained by Ward Transformer before any internal components could be repaired or replaced. Ward Transformer's records indicate that on at least one occasion, Ward Transformer replaced the free-flowing oil contained in Georgia Power's transformers with new oil. Supra at 21.

What is more, Georgia Power had a keen awareness of the PCB contents of its transformers and their hazardous nature. It also knew from its own employees' experiences that transformer repairs were likely to result in the spilling and disposal of oil. Significantly, the district court described such disposal events at the Ward Transformer facility as "inevitable." Carolina Power & Light Co., 921 F. Supp. 2d at 494 n.14.

In this Circuit, we have long recognized that "subjective states and objective manifestations of intent . . . present interpretive issues traditionally understood to be for the trier of fact." Charbonnages, 597 F.2d at 415 (citing Cram v. Sun Ins. Office, Ltd., 375 F.2d 670, 674 (4th Cir. 1967)); see also,

57

e.g., Gen. Analytics Corp. v. CNA Ins. Cos., 86 F.3d 51, 54 (4th Cir. 1996) (citation omitted) ("[D]etermining intent is fact-intensive, and when the circumstantial evidence of a person's intent is ambiguous, the question of intent cannot be resolved on summary judgment.").

As in Cello-Foil, Georgia Power may well have disposed of the transformers at issue here for economic gain. That the arrangement was economically beneficial does not, however, mean that it was not also intended as a way of getting rid of hazardous materials. A transaction may have multiple purposes, and a reasonable finder of fact could determine here that in selling its transformers to Ward Transformer, Georgia Power intended to "dispose of" the used transformers and the PCB-laden oil therein.

C.

In reaching the opposite conclusion, the majority accords essentially no significance to Georgia Power's use of terms like "dispose" and "scrapping" to describe its treatment of the transformers it sold to Ward Transformer. It is true that Burlington Northern instructs courts to look "beyond the parties' characterization of the transaction as a 'disposal' or a 'sale' and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." 556 U.S. at 610. However, this does not

58

give courts license to ignore the language that the parties use to describe their own actions, particularly given the "indispensable role that state of mind must play in determining whether a party has otherwise arranged for disposal . . . of hazardous substances." 556 U.S. at 611 (internal quotation marks and citation omitted).

In Pneumo Abex, we identified several factors courts have looked to in determining the intent of a transaction, i.e., to discern whether it "was for the discard of hazardous substances" or "for the sale of valuable materials": whether the materials were to be reused entirely or reclaimed and then reused; the value of the materials sold; the usefulness of the materials in the condition in which they were sold; and the state of the product at the time of transferal. Pneumo Abex, 142 F.3d at 775 (citations omitted). Contrary to the majority opinion, applying the factors set out in Pneumo Abex do not support the determination that the intent of these transactions can be determined as a matter of law.

Regarding the first factor, the parties could not have intended that the Georgia Power's transformers would be used "in their entirety." Id. For Ward Transformer to "reuse" Georgia Power's transformers, nearly half of which were identified as "scrap" or "faulty", J.A. 650–51, 658, 667, Ward Transformer had to open the transformers and replace worn-out and broken PCB-

59

tainted parts.  This stands in stark contrast to the pesticides at issue in Burlington Northern, which were an "unused, useful product" in their present condition.  556 U.S. at 612.

Regarding the second factor—"the value of the materials sold"—the majority opinion suggests that this factor favors Georgia Power because Ward Transformer was able to resell the transformers at a profit.  However, a party is not absolved of liability as an arranger merely because it is able to identify some market, however small, for a product containing the hazardous substances it seeks to discard.  And as already discussed, a transaction may have multiple motivations, including economic gain and disposal of hazardous substances.[1]

The third Pneumo Abex factor looks to the "usefulness of the materials in the condition in which they were sold."  142 F.3d at 775.  This factor is crucial to assessing the intent of

_____

[1] The majority also points to NCR Corp. v. George A. Whiting Paper Co., as supporting summary judgment for Georgia Power here.  768 F.3d 682, 706 (7th Cir. 2014).  In NCR, the Seventh Circuit affirmed the district court's determination that a paper company which sold a hazardous byproduct of the paper manufacturing process to a recycling mill was not liable as an arranger under CERCLA.  Importantly, however, the district court there had conducted a trial on the issue of arranger liability and found that "[the paper company's] main purpose in selling broke was not to get rid of it, but instead to place it on a competitive market and recoup some of its costs of production." Id. at 705.  The Seventh Circuit correctly recognized that it could disturb this factual finding only if it were clearly erroneous, which it was not.  Here, by contrast, there has been no trial, and we must construe all the facts and reasonable inferences therefrom in favor of Consol and PCS.

60

an arranger because a party selling a product that is useful in its present condition quite clearly does not contemplate the disposal of hazardous substances through the sale. Many of Georgia Power's transformers were not useful in the condition in which they were sold. Many had to be "remanufactured, which included removing defective parts" that would have been dripping with PCB-tainted oil. J.A. 3407. Additionally, repair to the core and coils of these transformers would have required Ward Transformer to "drain" the transformers of any free-flowing oil so that the core and coil could be removed. J.A. 1002.[2]

---

[2] In its decision below, the district court relied in large part on Florida Power & Light Co. v. Allis Chalmers Corp., 893 F.2d 1313, 1319 (11th Cir. 1990), for the proposition that Georgia Power's surplus transformers were useful "in the condition in which thy were sold." Pneumo Abex, 142 F.3d at 775. According to the district court, Florida Power & Light held that "forty year-old transformers with PCB-laden oil, sold as scrap at the end of their useful lives, were still a useful product at the their sale to a salvage company." Carolina Power & Light Co., 921 F. Supp. 2d at 498. But that entirely mischaracterizes Florida Power & Light.

In Florida Power & Light, a utility purchased transformers containing PCB-tainted oil from the manufacturers of the transformers and used them in their business for forty years. 893 F.2d at 1315. At the "end of their useful life," the utility sold the transformer to a scrap metal company, which reclaimed the metals contained in the transformers and resold them. Id. at 1315. During the reclamation process, oil contaminated the scrap metal site. The issue the Eleventh Circuit addressed was whether the utility and the scrap metal company could recover from the original manufacturers of the transformers. Not surprisingly, the Eleventh Circuit answered that question in the negative. Indeed, as the Supreme Court recognized in Burlington Northern, "an entity could not be held liable as an arranger merely for selling a new and useful
(Continued)

61

At the end of the day, this appeal comes down to the guiding star for arranger liability: intent. Intent is generally a question for the finder of fact, and nothing here makes this case so unusual that it whips the intent inquiry out of the factfinder's province and into ours.

III.

Viewing the evidence and reasonable inferences in the light most favorable to Consol and PCS, as we must on summary judgment, a reasonable factfinder could decide that Georgia Power intended, at least in part, to dispose of hazardous waste when it sold Ward Transformer its used, broken, and obsolete transformers laden with carcinogen-ridden oil at "scrapping" auctions. Accordingly, I respectfully dissent.

---

product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." 556 U.S. at 610. The Eleventh Circuit's decision in favor of the manufacturers thus in no way supports the proposition that used, broken, and obsolete transformers are "useful[] . . . in the condition in which they were sold." Pneumo Abex Corp., 142 F.3d at 775.

It is also notable that the utility that sold the transformers for scrap in Florida Power & Light participated in cleanup efforts at the contaminated site. See United States v. Pepper's Steel & Alloys, Inc., 658 F. Supp. 1160 (S.D. Fla. 1987). Thus, Florida Power & Light does not exempt Georgia Power from contributing to the cleanup costs here.

62